UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

FACTORY MUTUAL INSURANCE
COMPANY (as Assignee of ALBANY
MOLECULAR RESEARCH, INC. and OSO
BIOPHARMACEUTICALS
MANUFACTURING, LLC),

    Plaintiff,

v.                                                                                                                               Civ. No. 17-760 GJF/LF

FEDERAL INSURANCE COMPANY and
DOES 1-10,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court upon Defendant's "Motion for Partial Summary" Judgment [ECF 64] ("Motion"). The Motion is fully briefed. *See* ECFs 81 (Plaintiff's Response), 91 (Plaintiff's Errata Notice), 101 (Defendant's Reply). For the reasons articulated below, the Court will **GRANT IN PART** and **DENY IN PART** this Motion.

## I. BACKGROUND

On July 31, 2014, a lightning storm occurred near a manufacturing plant of OSO Biopharmaceuticals Manufacturing, LLC ("OSO") in Albuquerque, New Mexico. ECF 50 at 11. At approximately 6:23 p.m. that evening, a lightning strike was recorded within 0.2 miles of this facility, which at the time was being used to manufacture an injectable antibiotic, Cubicin (daptomycin), for treating complicated infections. *Id.* at 12. Around this same time, the facility experienced a power interruption and doors leading from an interior "clean room" unexpectedly opened, while certain fans and other equipment shut down. *See* ECFs 47 at 3; 68 at 4; 71 at 8. Unacceptable levels of mold were later detected in this room, requiring OSO to discard the

antibiotics that it was producing and cease further production until remediation efforts concluded in December 2014. *See* ECFs 47 at 5; 50 at 6; 68 at 3.

As a result, OSO submitted a claim for over $10 million in losses to Defendant Federal Insurance Company. *See* ECF 50 at 5. Defendant paid OSO the maximum sublimit of $600,000 under two of its contract provisions. *Id.* OSO then submitted a claim to Plaintiff Factory Mutual Insurance Company, which ultimately paid $7,385,110 to OSO for its losses. *Id.* at 6. Plaintiff, as an assignee of OSO, now seeks reimbursement from Defendant. *Id.* at 5. Plaintiff's fundamental claim is that Defendant breached its insurance contract by not paying for the loss under its "Building and Personal Property for Life Sciences" ("BPPLS") provision, which provided much higher limits of coverage. *See* ECF 64 at 2-3.

In the instant Motion, Defendant seeks summary judgment on a sole issue. Mot. 1. Specifically, it argues that—if its BPPLS provision applies—the parties' "other insurance" provisions would nevertheless "cancel each other out" and result in a respective 54 and 46 percent "apportionment of the loss" as between Defendant and Plaintiff. *Id.* at 1-2, 7.

## II. PERTINENT FACTS

### A. Coverage Under the Policies

Defendant's policy caps coverage at $58,286,814 for an insured "Building," $56,340,820 for "Personal Property" (e.g., pharmaceutical products), and $32,000,000 for any resulting "Business Income" loss (i.e., business interruption). ECF 47-2 (Defendant's insurance policy) at 16-17, 19.[1] Defendant's BPPLS provision states that it will "pay for direct physical loss or damage

---

[1] *See also id.* at 18-19 (Defendant's policy including OSO's buildings in Albuquerque); ECFs 50 at 8; 71 at 9 (no dispute that personal property includes the "pharmaceutical product"); ECF 47-2 at 75 (Defendant's policy discussing coverage for the *interruption*, or "impairment," of the insured's business); ECF 75 at 4 (Defendant characterizing its potential liability for business income loss as "any resulting *business interruption* loss" that stems from a loss to the insured's "building or personal property" (emphasis added)).

2

to: building; or personal property, that is caused by or resulting from a peril not otherwise excluded." *Id.* at 92; *see also id.* at 75 (separate provision requiring Defendant to pay for resulting business interruption losses). Defendant's policy, however, generally excludes losses resulting from "contaminants" (e.g., mold), unless an exception applies:

> This insurance does not apply to loss or damage caused by or resulting from the mixture of or contact between property and a contaminant . . . . [unless] the mixture or contact is directly caused by or directly results from a specified peril [e.g., lightning] . . .

*Id.* at 104.

For its part, Plaintiff's policy provides coverage, pursuant to its "Automatic Coverage" provision, up to $50,000,000 for "insured physical loss or damage to insured property at any location" that occurs within 90 days of the property's acquisition. ECF 64-2 (Plaintiff's insurance policy) at 18, 36.[2] This coverage protects against "all [non-excluded] risks of physical loss" and applies to "Real Property," "Personal Property," and "time element loss[es]" (i.e., business interruption). *Id.* at 14, 26, 54-59.[3] Plaintiff's policy likewise excludes contamination, while also providing an exception to this exclusion—one that implicitly incorporates damage caused by lightning:

> This Policy excludes . . . contamination, and any cost due to contamination . . . . If contamination due only to the actual not suspected presence of contaminant(s) directly results from other physical damage not excluded by this Policy [e.g., lightning], then only physical damage caused by such contamination may be insured . . . .

*Id.* at 31.

---

[2] Plaintiff's contract was with Albany Molecular Research, Inc., which acquired OSO on July 1, 2014—only 30 days before the lightning strike occurred. *See* ECF 50 at 15.

[3] *See also* ECF 101-2 at 3 (Plaintiff's May 10, 2016 letter to the insured, concluding that Plaintiff was liable for "direct physical loss and damage to the [insured's] real and personal property and resultant *business interruption*" (emphasis added)).

### B. "Other Insurance" Provisions

Each party's policy has an "other insurance" provision—a provision that assigns primary liability to the "other" insurer. Defendant's "other insurance" provision states the following:

> If you have any other insurance covering the same loss or damage as is insured against by this policy, we will only pay for the amount of loss or damage which is insured against by this policy in excess of the amount due from such other insurance, whether you can collect on such other insurance or not.

ECF 47-2 at 170. And Plaintiff's "other insurance" provision states the following:

> A. If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.
>
> B. In no event will this Policy apply as contributing insurance.

ECF 64-2 at 84.

### III. ISSUES

Assuming—for purposes of this Motion only—that Defendant is liable under its BPPLS provision, this Court will determine whether there is "no genuine dispute as to any material fact and [Defendant] is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), on four specific issues raised by Defendant's Motion:

(1) whether Plaintiff would also be liable under its Automatic Coverage provision;

(2) whether the parties' "other insurance" clauses are "mutually repugnant"—i.e., whether, if applied simultaneously, they would "leave the insured with no coverage," *CC Housing Corp. v. Ryder Truck Rental, Inc.*, 746 P.2d 1109, 1112-13 (N.M. 1987);

(3) whether the parties' policies cover "the same risk," *Maryland Cas. Co. v. State Farm Mut. Auto. Ins. Co.*, 419 P.2d 229, 233-34 (N.M. 1966); and

(4) whether a "proration of the loss," *CC Housing Corp.*, 746 P.2d at 1113, would require Defendant and Plaintiff respectively to be responsible for 54 and 46 percent of the loss.

*See* Mot. 2, 5-8; Resp. 2-7; Reply 6-9.

## IV. APPLICABLE LAW

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'judge's function' in evaluating a motion for summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Salazar-Limon v. City of Houston*, 137 S. Ct. 1277, 1280 (2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 249 (1986)); *see also First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U. S. 253, 289 (1968) (the question at summary judgment is whether a jury should "resolve the parties' differing versions of the truth at trial"). In evaluating such a motion, the Court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the . . . motion.'" *Scott v. Harris*, 550 U. S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U. S. 654, 655 (1962)).

### B. Applicable New Mexico Contract Law

"In cases arising under diversity jurisdiction, the federal court's task is . . . simply to 'ascertain and apply the state law.'" *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). In such diversity actions, the federal court must therefore "apply the substantive laws of the forum state," *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996), by "follow[ing] the most recent decisions of the state's highest court." *Wade*, 483 F.3d at 665-66 (citing *Wankier*, 353 F.3d at 866). And "[w]here no

controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." *Id.* at 666 (quoting *Wankier*, 353 F.3d at 866).[4]

"New Mexico law treats an insurance policy as an ordinary contract to be construed according to customary principles of contract interpretation." *Carolina Cas. Ins. Co. v. Nanodetex Corp.*, 733 F.3d 1018, 1022 (10th Cir. 2013) (citing *Rummel v. Lexington Ins. Co.*, 945 P.2d 970, 976 (N.M. 1997)). Consequently, "the interpretation of terms within an insurance policy is 'a matter of law about which the court has the final word.'" *United Nuclear Corp. v. Allstate Ins. Co.*, 285 P.3d 644, 647 (N.M. 2012) (quoting *Rummel*, 945 P.2d at 984); *Ace Am. Ins. Co. v. Dish Network, LLC*, 883 F.3d 881, 887 (10th Cir. 2018).

### 1. *Ambiguities and Grants of Coverage Construed in Favor of the Insured*

The New Mexico Supreme Court has opined that, "[a]s with other contracts, where an insurance policy's terms have a common and ordinary meaning, that meaning controls in determining the intent of the parties." *United Nuclear Corp. v. Allstate Ins. Co.*, 285 P.3d 644, 647 (N.M. 2012) (internal quotation marks omitted). "But where a policy term is reasonably and fairly susceptible of different constructions, it is deemed ambiguous and must be construed against the insurance company as the drafter of the policy." *Id.* at 648 (internal quotation marks omitted); *see also Battishill v. Farmers All. Ins. Co.*, 127 P.3d 1111, 1115 (N.M. 2006) (stating "it is the law in New Mexico that an insurance policy which may reasonably be construed in more than one way should be construed liberally in favor of the insured" (internal quotation marks omitted)). And

---

[4] In making such a prediction, the federal court may "seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law." *Id.* (internal quotation marks and citations omitted). But the federal court "must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently." *Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 467 (1940). In addition, if the Tenth Circuit has "rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit . . . unless an intervening decision of the state's highest court has resolved the issue." *Wankier*, 353 F.3d at 866 (citations omitted).

"this principle applies with added force" when "limitations upon coverage are concerned." *United Nuclear Corp.*, 285 P.3d at 656 (quotation marks omitted). Similarly, "[g]rants of coverage," including through "an exception to an exclusion," should be "construed broadly in favor of the insured." *Id.* at 649 (quotation marks and citations omitted).

"The insurance contract . . . will be construed as a whole. If any provisions appear questionable or ambiguous, [the court] will first look to whether their meaning and intent is explained by other parts of the policy." *Rummel*, 945 P.2d at 976 (citations omitted).[5] Furthermore, "the language at issue should be considered not from the viewpoint of a lawyer, or a person with training in the insurance field, but from the standpoint of a reasonably intelligent layman, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words." *Id.* (internal quotation marks omitted). If an ambiguity does exist, a court not only construes it "in favor of the insured and against the insurer" but is also "guided by the reasonable expectations of the insured." *United Nuclear Corp.*, 285 P.3d at 648 (internal quotation marks and citations omitted).[6]

### 2. *Mutually Repugnant Clauses*

"If two or more 'other insurance' clauses are of a nature that a court, to give effect to the intent of each clause simultaneously, must leave the insured with no coverage for which premiums have been paid, then the clauses are mutually repugnant." *CC Housing Corp. v. Ryder Truck Rental, Inc.*, 746 P.2d 1109, 1112-13 (N.M. 1987); *State Farm Fire & Cas. Co. v. Farmers Alliance*

---

[5] "If ambiguities cannot be resolved by examining the language of the insurance policy, courts may look to extrinsic evidence such as the premiums paid for insurance coverage, the circumstances surrounding the agreement, the conduct of the parties, and oral expressions of the parties' intentions." *Id.* at 977 (citation omitted).

[6] *See also W. Commerce Bank v. Reliance Ins. Co.*, 732 P.2d 873, 875 (N.M. 1987) (emphasizing that "the test is not what the insurer intended its words to mean, but what a reasonable person in the insured's position would have understood them to mean"); *Rummel*, 945 P.2d at 976 (stating that "ambiguous terms will be given the strongest interpretation against the insurer which they will reasonably bear" (internal quotation marks omitted)).

*Mut. Ins. Co.*, 96 P.3d 1179, 1182 (N.M. Ct. App. 2004). Generally, if such clauses are "mutually repugnant," then "public policy dictates the equitable solution of holding both policies primarily liable and requiring proration of the loss in proportion to the respective limits of each policy." *CC Housing Corp.*, 746 P.2d at 1113. But such a "pro rata payment of loss [does] not apply" unless the policies "cover the same interest, the same property and *the same risk*." *Maryland Cas. Co. v. State Farm Mut. Auto. Ins. Co.*, 419 P.2d 229, 233-34 (N.M. 1966) (emphasis added) (internal quotation marks omitted); *see also State Farm Fire & Cas. Co.*, 96 P.3d at 1182 (holding one of two insurers primarily liable, even though their policies contained mutually repugnant "other insurance" clauses, when the policies "cover[ed] *risks that differ* in size and type" (emphasis added)).

V. ANALYSIS

**A. Plaintiff Is Liable Under Its Automatic Coverage Provision**

This Court holds that—if Defendant is liable under its BPPLS provision—Defendant is entitled to judgment as a matter of law that Plaintiff is liable under its Automatic Coverage provision. To begin, for Defendant's BPPLS provision to apply, lightning must have "directly caused" the mold contamination, which in turn must have caused the "direct physical loss [and] damage" to OSO's building and personal property (and further resulted in business interruption losses). ECF 47-2 at 92, 104; ECF 50 at 14. Consequently, such damage would also be covered under Plaintiff's Automatic Coverage provision—as it covers "physical damage" caused by "the actual . . . presence of contaminant(s) directly resulting from other [non-excluded] physical damage," such as lightning. ECF 64-2 at 14, 31. In other words, if lightning initiated the chain of events that directly caused the mold, and the mold caused this physical damage, then both Defendant's BPPLS provision *and* Plaintiff's Automatic Coverage provision would apply.

8

Although Plaintiff paid over $7.385 million to OSO, it now claims that it was not liable at all for OSO's loss. *See* Resp. 3, 5-6. Specifically, it argues that, although Defendant's policy covers a lightning strike that directly causes mold, its policy does not—asserting that a lightning strike would not qualify as "physical damage" under its policy. *See id.* at 3.[7] But even viewing the facts and drawing reasonable inferences in a light most favorable to Plaintiff, the Court nonetheless concludes that a lightning strike 0.2 miles from OSO's facility—which directly causes mold in that facility—*does* qualify as "physical damage" for at least three reasons. First, as Plaintiff agreed to be liable for contamination directly resulting from "physical damage *not excluded*," ECF 64-2 at 31 (emphasis added), it could have excluded lightning but did not. *See* ECF 64-2. Second, this Court must broadly construe such a grant of coverage "in favor of the insured." *United Nuclear Corp.*, 285 P.3d at 649. Third, whether "physical damage" is interpreted to have a "common and ordinary meaning," *id.* at 647, or to be ambiguous (and therefore "construed liberally in favor of the insured," *Battishill*, 127 P.3d at 1115), this Court finds that either interpretation includes the lightning strike for purposes of the instant Motion.

### B. The "Other Insurance" Clauses Are Mutually Repugnant

This Court holds that there is no genuine factual dispute and Defendant is entitled to judgment as a matter of law that the parties' "other insurance" clauses are "mutually repugnant." *CC Housing Corp.*, 746 P.2d at 1113. Although Plaintiff argues that the policies cover different risks, *see* Resp. at 4-7; Section V(c), *infra*, it does not dispute that the actual language of these clauses is mutually repugnant. Indeed, Defendant disclaims primary liability if Plaintiff's

---

[7] *But cf.* ECF 101-2 at 3 (Plaintiff concluding, in its May 10, 2016 letter to OSO, that "the mold contamination . . . was the direct result of the lightning strike" and that, pursuant to its Automatic Coverage provision, it was therefore liable for OSO's "direct physical loss and damage to [its] real and personal property and resultant business interruption"). The Court believes that the best proof that Plaintiff's policy insured against this risk and covered the losses occasioned by it *is that Plaintiff paid its insured $7.385 million under the policy for these losses*. In so doing, the insurer consulted the policy it had drafted and construed its exceptions and exclusions in a manner favorable to its insured. *See id.* at 1-2. The Court agrees with Plaintiff's construction and application of its own policy.

insurance covers the same insured "loss or damage," and Plaintiff likewise disclaims primary liability if Defendant's insurance "would apply in the absence of" Plaintiff's insurance. ECF 47-2 at 170; ECF 64-2 at 84. Consequently, this Court holds that "[these] clauses are of a nature that," if applied simultaneously, the insured would have "no coverage for which premiums have been paid" and that these clauses are therefore "mutually repugnant." *CC Housing Corp.*, 746 P.2d at 1112-13.

### C. The Parties' Policies Cover the Same Risk

Although these "other insurance" clauses are mutually repugnant, a "pro rata payment of loss [does] not apply" unless the policies "cover the same interest, the same property and the same risk" in favor of OSO. *Maryland Cas. Co.*, 419 P.2d at 233-34. Plaintiff argues that these policies cover different risks because "[m]old resulting from lightning is covered under [Defendant's] policy but not [Plaintiff's] policy" and because the policies "do not insure the same company, locations, or risks." Resp. 6. This Court disagrees.

As discussed in Section V(a), *supra*, both parties' policies *do* provide coverage against the lightning strike if it directly caused mold that resulted in OSO's physical damage. Furthermore, both policies cover physical damage to OSO's building and personal property (and the resulting business interruption loss). ECF 47-2 at 75, 92; ECF 64-2 at 26, 54-59. In addition, they insure the same company (i.e., OSO), the same location (i.e., the facility in Albuquerque that was affected by the lightning strike), and the same risk (i.e., physical damage to OSO's building and personal property, and the resultant business interruption loss, due to contamination directly resulting from lightning). *See* ECF 50 at 15; ECF 64-2 at 14, 36, 88. Consequently, this Court holds that there is no genuine factual dispute regarding whether the parties' policies cover the same risk. Therefore, the Court further holds that Defendant is entitled to judgment as a matter of law that

the parties' policies cover the same risks and that, as an "equitable solution," a "proration of the loss in proportion to the respective limits of each policy" is required. *CC Housing Corp.*, 746 P.2d at 1113.

### D. The Proration of the Loss Is an Issue for Trial

Defendant asks this Court to enter summary judgment that, if the BPPLS coverage applies and the policies "cancel each other out," Defendant and Plaintiff should respectively be responsible for 54 and 46 percent of OSO's covered losses. Mot. 6-7.[8] Plaintiff, however, asserts that Defendant and Plaintiff should respectively be responsible for 74 and 26 percent of the loss. ECF 93 (Errata Notice) at 2.[9]

Defendant further requests that Plaintiff's assertion, made through its 18-day-late Errata Notice [ECF 93], be stricken as violative of this Court's Local Rules. Reply 6-7 (citing D.N.M.LR-Civ. 56.1(b)). In addition, Defendant requests that the Errata be overridden by Plaintiff's allegations in the complaint, which only mention one of the three applicable "blanket limits of insurance"—i.e., the $58,286,814 Building coverage limit (but not the $ 56,340,820 Personal Property limit or the Business Interruption limit of $32,000,000). Reply 7-8 (citing ECF 1 at 2-4, 7). It is clear to this Court, however, that all three of these limits are indeed relevant parts of Defendant's insurance policy. *See, e.g.,* ECF 47-2 at 16-17, 19. Furthermore, this Court is not convinced—either through the cases Defendant cites or in its search for an "equitable solution"— that by mentioning only a single coverage limit in its complaint, Plaintiff somehow made a binding,

---

[8] These percentages are based on Defendant's Building coverage limit of $58,286,814 and Plaintiff's Automatic Coverage limit of $50,000,000. *See* ECF 47-2 at 16; ECF 64-2 at 18. Thus, Defendant's share was calculated at $58,286,814 / $108,286,814 = 53.83 percent, while Plaintiff's share was calculated at $50,000,000 / $108,286,814 = 46.17 percent.

[9] These percentages are based on Defendant's Building coverage limit of $58,286,814—*plus* Defendant's Personal Property limit of $56,340,820 and Business Interruption limit of $32,000,000—in addition to Plaintiff's Automatic Coverage limit of $50,000,000. *See id.* Thus, Defendant's share was calculated at $146,627,634 / $196,627,634 = 74.57 percent, while Plaintiff's share was calculated at $50,000,000 / $196,627,634 = 25.43 percent.

11

irreversible "judicial admission" requiring the Court to ignore the plain, undisputed facts before it when apportioning the loss. *See* Reply 7-8; *see also* Tr. 125-26 [ECF 114] (defense counsel acknowledging that Defendant affirmatively did not dispute its three applicable policy limits in other filings in this case).

At an omnibus hearing on October 16, 2019, Defendant proposed an alternative method for proportionally allocating the loss between the parties. *See* Tr. 127-31. The Court, however, is of the opinion that neither Plaintiff's proposal nor Defendant's proposal correctly captures a true *proportional* allocation of the loss.[10] It would seem that the correct approach is an amalgam of Plaintiff's and Defendant's proposals—one that both accounts for Defendant's three individual maximum limit categories (building, personal property, and business interruption) and for Plaintiff's one maximum limit, which is spread across these categories.[11] As Defendant's proposal was aired for the first time at oral argument, as neither party has adequately briefed the correct proportional allocation in a case such as this, and as there appears to be a genuine factual dispute as to how the specific damages will be categorized (potentially affecting proration percentages,

---

[10] For example, assuming OSO's loss is divided into three categories (building, personal property, and business interruption), Plaintiff's proposal (in which Plaintiff's $50,000,000 is simply calculated as a percentage of all the maximum limits, i.e., $50,000,000 / $196,627,634) is tantamount to removing Defendant's three individual maximum limits and simply imposing one maximum limit on Defendant of $146,627,634 for any loss within these three categories—regardless of what particular category (or combination thereof) the loss coincides with. On the other hand, Defendant's proposal (in which Plaintiff's $50,000,000 is calculated as a percentage of each of these three categories, i.e., $50,000,000 / $108,286,814 (building), $50,000,000 / $106,340,820 (personal property), and $50,000,000 / $82,000,000 (business interruption)) is tantamount to requiring Plaintiff to provide a maximum limit of $50,000,000 for *each* of these three categories (for a total coverage of $150,000,000).

[11] For example, assuming—purely for the sake of illustration—that OSO's total covered loss is distributed among the three categories as follow: 25 percent for building, 35 percent for personal property, and 40 percent for business income, then it would seem that Plaintiff's $50,000,000 should be *proportionally* calculated among these three categories as follows: (.25) x $50,000,000 / $108,286,814 (building), (.35) x $50,000,000 / $106,340,820 (personal property), and (.40) x $50,000,000 / $82,000,000 (business interruption). Therefore, Plaintiff would be responsible for 11.54 percent of the building losses, 16.46 percent of the property losses, and 24.39 percent of the business interruption losses.

depending on the calculation method used), *see, e.g.,* Tr. 127-31, 135-37, the Court will DENY Defendant summary judgment on the proration of OSO's loss.

## VI. CONCLUSION

For the reasons stated above, this Court holds that—if Defendant is liable to OSO under its BPPLS provision—then (1) Plaintiff is also liable to OSO under its Automatic Coverage provision, (2) the "other insurance" clauses are mutually repugnant, (3) the parties' policies cover the same risk and require a "proration of the loss in proportion to the respective limits of each policy," *CC Housing Corp.*, 746 P.2d at 1113, and (4) there is a genuine issue of material fact regarding the proration of the insured's covered losses.

**IT IS THEREFORE ORDERED** that Defendant's Motion is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) Defendant's Motion is **GRANTED IN PART** in that, if Defendant's BPPLS Coverage applies, the parties' "other insurance" provisions are deemed mutually repugnant and the insured's covered losses shall be prorated pursuant to the parties' respective policy limits.

(2) Defendant's Motion is **DENIED IN PART** in that there is a genuine issue of material fact regarding the proration of the insured's covered losses.

**SO ORDERED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*